## R. S. HUDSON, EXECUTOR, ET AL. *v.* ELLA GRAY.

1. WILL. *Construction of conflicting clauses.    Case in judgment.*

   G. died, leaving a last will and testament, the second item of which devised and bequeathed to his four children all of his estate, real and personal (except a certain portion given to his wife), to be equally divided between them.    There was a codicil, which, after reciting the provisions of the will, was in these words : "It is my desire and will that if any of my children shall die without any legal male descendants, then the property to which they may be entitled under the second item of my will shall go to and be distributed among my then surviving children, share and share alike.    And it is further my will and desire that if any of my children shall die *bearing* issue, then such issue or descendants shall take the parts of my estate their father or mother (as the case may be) would have taken, had he or she survived."    In order to construe the codicil so that both clauses thereof may be preserved, it is proper to interpolate the word *male* before the words "issue" and " descendants," wherever they occur in the second clause.    The intention of the testator, upon a legal construction of the will and codicil, was, that if any of his children should die without leaving male issue or descendants, his or her portion of the estate should go to the other children of the testator, or their male issue or descendants ; and that any property thus mediately acquired should be held by those acquiring the same, subject to the condition that they should themselves die leaving male issue or descendants, just as they held the property directly devised and bequeathed to them.

2. SAME. *Limitation of fee-tail estate.    Code 1857, p. 307, art. 3.*

   The codicil above recited, when legally construed, excludes the female grandchildren of the testator from sharing in his estate, and gives to those taking the portion of a deceased brother or sister his or her share, subject to the same conditions and limitations under which it was held by the original devisee and legatee ; and as the estate thus limited may be held by each of the four children of the testator in succession, the limitation as to the land is void, and the children of the testator take each an estate in fee-simple, under art. 3, p. 307, of the Code of 1857 (then in force), the effect of which was to convert all limitations of fee-tail estates in land into fee-simples, except where the limitation was to a succession of donees not exceeding two.    But that statute did not embrace personalty, and as to it the intention of the testator may be effectuated.

3. ESTATE OF DECEDENT. *Unequal distribution of personalty.    Petition to sell land.*

   The fact that the personal estate of a decedent has been unequally distributed to the legatees does not authorize the court administering the estate to grant a petition of the executor for the sale of the lands of the estate to equalize the distribution.    Nor can such petition be granted upon the verbal agreement of the distributees.

4. SAME. *Payment of debts.    Personalty.    Realty.    Devisee.*

   The personal estate of a decedent must be first applied to the payment of his

debts; and where it has been thus applied, the executor has no right to sell land devised to one having no interest in the personal estate, in order to force such devisee to contribute towards the payment of the debts of the testator.

5. SAME. *Payment of taxes on land devised. Reimbursement.*
Where an executor, with the money of the estate or with his own money, has paid the taxes on land devised by the testator to one having no interest in the personalty of the estate, he is entitled to subject such land to sale to reimburse the estate or himself for the taxes thus paid.

6. SAME. *Payment of military tax. Right to reimbursement.*
The executor, having paid taxes in the circumstances above recited, has the same right to reimbursement for taxes levied during the civil war for military purposes as for any other taxes.

7. SAME. *Payment of taxes by devisee. Reimbursement.*
The husband of a devisee in possession of land belonging to the estate of the testator, and enjoying the rents and profits thereof, is not entitled to reimbursement from the executor for money paid for taxes on the land.

APPEAL from the Chancery Court of Winston County.

Hon. F. A. CRITZ, Chancellor.

The case is stated in the opinion of the court.

*R. S. Hudson*, for the appellants.

If the appellee is entitled to any share in the estate of John F. Gray, then the lands should be sold for partition and to equalize the distribution between the devisees and legatees. The inequality of the distribution is greatly against the appellee. W. H. Gray was a party to such unequal distribution, and was bound by it both as a distributee and as coexecutor; and his daughter, the appellee, is estopped to deny it, or to oppose the equalization thereof. Herman on Estop. 7–12, 358–390, 409–440; 8 Watts, 280; 6 Harris, 343; 7 Harris, 424; 2 Smith's Ld. Cas. 653, 663; 1 Greenl. on Ev., sects. 27, 207; 1 Story's Eq., sect. 385; 26 Miss. 521; 32 Miss. 324; 35 Miss. 321; 36 Miss. 174; 3. Ves. 678; 2 Ves. jr. 698; 2 P. Wms. 82; 3 Sim. 370; 3 Russ. 149; Bright's Hus. & W. 259; 1 Swan, 437; 9 Ga. 23. *Fonte* v. *Horton*, 7 Geo. 350, and *Lawson* v. *Jeffrey*, 10 Geo. 791, are cases in point.

The court below erred in refusing to allow the executor for payments made by him for taxes — State, county, and Confederate — paid during the war. He should certainly have been

allowed for payments of State and county taxes ; and, I think, also for payment of Confederate taxes.   The executor was acting under the authority of the laws in force, and in obedience and submission to the ruling powers ; and neither he nor any one else could tell what would be the result of the war, nor what would be the consequences of a failure to pay the taxes imposed on the lands.

*M. Green*, on the same side.

My construction of the will and codicil is this : (1) that the word " issue," in item second of the codicil, means children generally, or heirs, and not " legal male descendants ;" (2) that item second of the codicil does not antagonize item second of the will and item first of the codicil, construed together, but is in strict accord with them ; (3) that item second of the codicil does not limit the second item of the will and first item of the codicil ; (4) that item second of the codicil is explanatory of item first, and provides for a proper construction of the rights of the child (or his or her issue) who has performed the condition imposed by item first of the codicil, and died before his exact interest could be ascertained ; (5) that W. H. Gray, Mrs. Martha Hudson, Mrs. Potts, and Mrs. Elvira Hudson were tenants in common of a conditional fee, with a *jus accrescendi* upon failure of any one to perform the condition, the fee to be absolute in those who did perform the condition ; (6) that said children took a conditional fee, and not a " life-estate ;" (7) that there was no remainder to " heirs male ;" (8) that item second of the codicil fixed the *quantum* of the estate, but the issue would take by descent, and not by purchase, descent being the superior title ; (9) that the second item of the codicil is in perfect harmony with the proper construction of the second item of the will and first of the codicil, and it is unnecessary to limit the meaning of any word in said second item of the codicil, or to give it any but its ordinary signification.

The chancellor erred in holding that the will and codicil violated the statute (Code 1857, p. 307, art. 3) in attempting to

limit an executory devise in succession to four persons then living. A "succession" means that one donee shall succeed the other in the estate ; that during the continuance of the estate of the first donee the second has no interest in the estate, except in expectancy. The children of John F. Gray were all seized as tenants in common of a conditional fee. Each took a present vested estate, subject to be divested by non-performance of a condition. Each was seized of his estate from the beginning. The estates were original estates, and there could be no succession.

The appellee, who claims through her father, is only entitled to share in the realty of her grandfather's estate. She has no right to any of the personalty of the estate. And as her father received a large amount of the personalty, exceeding his share of the realty, she is not entitled to any of the realty until she shall have accounted for the personalty received by her father.

*T. J. O'Neill,* for the appellee.

The testator meant, by the codicil to his will, to limit his estate to the male descendants of his children forever. This conclusion is reached by construing items first and second together, and this must be done in order that either may stand. See 2 Jar. on Wills, 32 ; 2 Williams on Ex. 811 ; 1 Ves. jr. 150.

The devise attempted to be made is in violation of art. 3, p. 307, of the Code of 1857. The testator violated the statute in attempting to limit an executory devise in succession to four persons then living. Under this codicil, the estate may pass through four contingencies before becoming absolute. We have four executory devises limited, the one upon the other, in succession ; while the statute only permits a limitation to a succession of donees then living, not exceeding two. It follows, therefore, that W. H. Gray took a fee-simple estate under the will of his father. *McKenzie* v. *Jones,* 39 Miss. 230.

The appellee is not estopped by the fact that her father was a coexecutor, from impeaching Hudson's administration of the

estate for twenty consecutive years after her father's death. 33 Miss. 569; 36 Miss. 350. The surviving executor (Hudson) is not charged, in the restatement of the account under order of the court, with any claim which was lost before the death of W. H. Gray. For claims lost since that time by his negligence he is liable, and is chargeable with both principal and interest thereof. 3 Smed. & M. 473; 27 Miss. 767; 31 Miss. 578; 32 Miss. 335; 40 Miss. 256; 51 Miss. 211.

The lands of W. H Gray cannot be made, by any device, subject to sale to restore the amount received by him in excess of his share of the personalty. At the death of the testator the lands descended directly to the devisees, and the executor never had any title to, or control over them. 6 How. 235; 13 Smed. & M. 393; 37 Miss. 46; 40 Miss. 710; 44 Miss. 322.

The failure of the executor to take refunding bonds makes him liable for the excess of the personalty received by any legatee over his share. 26 Miss. 395; 2 How. 808; 3 How. 252; 3 Smed. & M. 625; 34 Miss. 83; 40 Miss. 181.

The realty of the estate cannot be touched by the executor where the power is not expressly given in the will. 39 Miss. 467; 44 Miss. 326; 2 Redf. on Wills, 120; 1 Williams on Ex. 546. The fact that no personalty remains, to make the legatees equal, does not authorize the lands to be sold and treated as personalty. 46 Miss. 245.

COOPER, J., delivered the opinion of the court.

On the thirteenth day of June, 1858, John F. Gray, of the county of Winston, died, leaving surviving him his wife, Mildred W. Gray, and four children, William H. Gray, N. E. Potts, Martha S. Hudson, and Elvira Hudson. By his will John F. Gray gave to his wife certain designated property, and the balance of his estate, both real and personal, he devised and bequeathed to his four children, to be equally divided between them, share and share alike. By a codicil, which recites the provisions of his will, he declares as follows: " Now,

it is my desire and will, that if any of my children shall die without any legal male descendants, then it is herein provided that the property to which they may be entitled under the second item of my will shall go to and be distributed among my then surviving children, share and share alike. And it is further my will and desire, that if any of my children shall die bearing issue, then such issue or descendants shall take the parts of my estate their father or mother (as the case may be) would have taken, had he or she survived." William H. Gray and Robert S. Hudson — husband of Elvira Hudson — were appointed executors, and on the death of the testator they proved the will, and were granted letters testamentary thereof. The testator left personal property of the value of about $100,000 (including notes for $14,676.59 due to him by his son, William H. Gray), and real estate worth probably $50,000 at the time of his death, but which is now worth much less.

Soon after the death of the testator, an order of the Probate Court was obtained for the sale of the personal property bequeathed (except the slaves); sale thereof was made, and the proceeds of sale (after the payment of most of the debts of the testator) were distributed, together with the slaves, among the distributees. On the fourteenth day of August, 1860, the first annual account of the executors was filed, in which allowances were asked, on account of distribution made to the distributees, for the following amounts: To Mrs. Potts, $23,926.85; to Mrs. M. S. Hudson, $21,249.77; to Mrs. E. Hudson, $19,178.71; to William H. Gray, $28,160.67. In this distribution was included the negroes belonging to the estate; and the notes due by William H. Gray were included in the amount distributed to him. In 1862 William H. Gray died, leaving surviving him only one child, the appellee, Ella Gray, who was then an infant of tender years, and no other descendants. Subsequent to the death of William H. Gray the surviving executor filed three annual accounts, none of which were allowed by the court. These accounts show the

collection of several small debts due to the estate, and the payment, at times when the executor had in his hands sufficient funds of the estate, of small debts due by it; but the principal items on them are charges for taxes paid by the surviving executor on the lands, some of which taxes were paid during the war, and presumably in Confederate currency. The real estate consisted principally of a tract of land in Lowndes County, which, it seems, by permission of the adult devisees, has since 1867 been occupied by Mrs. Potts, who was to pay the taxes thereon during her occupancy.

On the twenty-seventh day of October, 1879, on the motion of appellee in the Chancery Court of Winston County, the surviving executor was required to make final settlement of the estate. On the ninth day of April, 1880, said executor filed his final account, by which he claimed that the estate was indebted to him in the sum of $844.33, because of the transactions and payments made by him for account of the estate, as shown by his various annual accounts previously filed. All persons interested in this final settlement, except the appellee, by writing acknowledged the correctness of the final account as filed, and consented that it might be allowed as stated, without proof. Appellee appeared and filed numerous objections thereto, many of which were sustained, and the account was ordered to be restated in accordance with the views of the chancellor, which being done, it appeared that the estate was not indebted to the executor in any sum whatever; but as all other persons interested, except the appellee, had consented to the allowance of the account as first stated, it was ordered that it should be so allowed as to them. The particulars of this accounting, so far as they are material to the decision of these suits, will be hereafter noticed.

On the second day of July, 1877, R. S. Hudson, as surviving executor, filed his petition in the Chancery Court of Winston County, stating therein the death of his testator, the terms of the will, the grant of letters testamentary to himself and William H. Gray, the distribution of the personal prop-

erty, the rendition of the first annual account by himself and
William H. Gray, the death of William H. Gray, and his own
expenditures on account of the estate, and that appellee was
the only child or descendant left by William H. Gray. He
charged that at the time of the distribution of the personal
property, and of the proceeds of such part thereof as was
sold, it was agreed between all the devisees that on final settle-
ment of the estate all inequalities in the distribution should be
equalized, either by payment by those who had received too
much to those who had received too little, or by sale of the
land devised, and such division of its proceeds as would effect
equality; that William H. Gray, who had possession of the
notes due by him to the estate, received and took them as so
much cash received by him in distribution; that the depre-
ciation of property incident to the result of the war made it
necessary to sell the lands, not only to equalize the portions of
the distributees, as they had agreed should be done, but also
to reimburse him (the executor) for expenditures made by
him on account of the estate, as shown by his last annual
account. He further charged that, because of the character of
the lands, partition could not be made, and that a sale was
necessary for partition. To this petition appellee answered,
denying all its material allegations except the death of John
F. Gray, the terms of his will and the probate thereof, the
grant of letters testamentary, and the death of her father,
leaving her his only child or descendant, and made her answer
a cross-petition praying for partition of the land, which she
charged was susceptible of division. To the cross-petition
Hudson (executor) and the co-tenants of appellee answered,
reiterating the allegations of the original petition; and, further
answering, they averred that by the codicil to the will of John
F. Gray, William H. Gray had only a life-estate in the lands
unless at the time of his death he should leave surviving him
male issue; that in default of such issue the fee in the lands
was devised to the then surviving children of the testator, or
to the male children of those who had died; that William H.

Gray at his death left no male children or descendants, and therefore appellee had no interest in the lands.

Proceedings in the chancery suit were suspended, by order of the chancellor, until testimony taken in both that cause and the matter of the final account, and the two cases were submitted to and decided by him at the same time. The decree on the final account was that, as to appellee, the account as restated by direction of the chancellor should be allowed. In the chancery cause a decree was made for partition of the lands as prayed by appellee in her cross-petition. From both these decrees the executor and the other devisees appeal, and the two appeals are now submitted together.

It is apparent that at the root of both cases lies the construction of the codicil to the will of John F. Gray.

By the will the land and personal property were given to the four children of the testator, as tenants in common ; but by the codicil it is provided, that " if any of my children shall die without any legal male descendants, then it is herein provided that the property to which they may be entitled under the second item of my will shall go to and be distributed amongst my then surviving children, share and share alike. And it is further my will and desire, that if any of my children shall die bearing issue, then said issue or descendants shall take the parts of my estate their father or mother (as the case may be) would have taken, had he or she survived." This language, if taken literally, produces an irreconcilable conflict in the terms of the codicil, and either makes it void for repugnancy, or, if the last sentence is to control, the first is as completely obliterated as if it had never been written. If, however, without doing violence to the intention of the testator, the instrument can be so read that all its clauses may be preserved, it ought to be so construed *ut res magis valeat, quam pereat.*

If the first clause of the codicil means anything, it is that the fee given by the will is retracted unless, at the death of each devisee, he or she shall leave surviving him or her male

descendants. Unless, therefore, this clause is to be annulled, it is evident that the codicil must be so read as to exclude from all interest in the property any child or children of either devisee whose parent shall die without male issue or descendants alive at the time of his or her death. If this clause of the codicil stood alone, the heirs generally of a devisee who died leaving male descendants him or her surviving would take by inheritance the estate of their ancestor, for by this clause the fee devised by the will is not limited to such male descendants; if there are male descendants, the fee as originally given by the will is not taken away, and as originally given it would descend to the heirs generally of the devisee.

The second clause of the codicil is, "if any of my children shall die bearing issue, then such issue shall take," etc. Now this clause either overturns the preceding one, or the class of persons therein referred to must be the same as that named in the first—*i.e.*, male descendants. It is impossible for both sentences to stand, giving to each its technical and usual meaning, for the first clause withdraws the fee if the devisee dies without "male descendants," while the second provides that if the devisee dies leaving "issue," such "issue" shall take the fee. To obviate this conflict between the two, it is permissible to restrict the meaning of the most general clause, and we therefore read the second sentence of the codicil as if it had been written thus: "And it is further my will and desire, that if any of my children shall die bearing *male* issue, then such *male* issue, or *male* descendants, shall take the parts of my estate their father or mother (as the case may be) would have taken, had he or she survived."

This is the only construction of the codicil by which both of its clauses can be preserved. From the codicil, so read, we discover the intention of the testator; and this intention, when discovered, is the guide by which we are to be led in the further construction of the will. As has been quaintly said by Swinburne in his treatise on Wills (vol. 1, p. 19): "The will of the testator is the queen or empress of the testament; because

the will doth rule or govern the testament; enlarge or restrain the testament, and in every respect moderate and direct the same; and is, indeed, the very efficient cause thereof. The will, therefore, of the testator ought, before all things, to be sought for diligently, and being found, ought in anywise to be observed faithfully. It ought to be sought for as earnestly as the hunter seeketh his game, and as to the sacred anchor ought the judge to cleave unto it, pondering not the words, but the meaning of the testator. For although no man may be presumed to think otherwise than as he speaketh (for the tongue is the utterer or interpreter of the heart), yet cannot every man utter all that he thinketh, and therefore are his words subject to his meaning.''

The intention of the testator here was to limit his bounty to his own children and to their male descendants; and that females, other than his own daughters, should not participate therein.

With this intention discovered, we proceed to further investigation. In the first sentence of the codicil it is provided that the portion of any child who shall die without any legal male descendants '' shall go to and be distributed amongst my then surviving children, share and share alike.'' Under this clause, how did the surviving devisees take the interest of William H. Gray at his death? Did they take the fee discharged of any condition that they should die leaving male descendants, or did the share of William H. Gray pass to them subject to the same condition as that upon which they held the portions directly devised to them? If they took absolutely, this strange result would be reached: Appellee could not take under the will, because her father left no male issue. Yet the daughters of those children of John F. Gray who took the part of her father would, upon the death of their parents, take this same property though their parents left surviving them no male issue; or, in other words, the daughters of the children of the testator might take that portion of the estate of the testator which they took mediately (or under the codicil), but

could not take that portion which the parent took immediately, under the will. Such result would be not only absurd, but in conflict with the intention of the testator, that only the male descendants of his children should take the property devised; and for these reasons such construction must be rejected. To uphold the codicil, we have been forced to interpolate the word " male " before the words " issue " and " descendants," in the second sentence thereof. The codicil, so interpolated, excludes the female grandchildren of the testator, and such exclusion can only be effectuated by holding that the devisee taking the portion of a deceased brother or sister under the codicil takes it with the same conditions, and subject to the same limitations, as it was in the hands of the original devisee. The result of this construction of the codicil is to make it obnoxious to the proviso to art. 3, p. 307, of the Code of 1857, which is as follows : "*Provided*, that any person may make a conveyance or devise of lands to a succession of donees then living, not exceeding two, and to the heirs of the body of the remainder-man, and in default thereof to the right heirs of the donor in fee-simple." The estate here limited may be held by each one of the children of the testator (four in number) in succession, and the limitation as to the land is therefore void, and William H. Gray took under the will a fee-simple. But the statute being applicable only to limitations of estates in lands, the personal property passed under the codicil, and appellee took no interest therein. Appellee, then, was entitled to have partition of the land, unless it ought to be sold to equalize the unequal distribution of the personal property, or for the purpose of reimbursing the executor for expenditures made by him in paying the debts of the testator or taxes on the land.

The facts charged and proved do not show any right, either in the executor or the other devisees, to subject the land to sale for the purpose of equalizing the previous distribution of the personal estate. If such right exists, it must arise either from the fact of the unequal distribution, or from the agree-

ment between the parties. It is clear that the distribution of the personal estate unequally did not alone confer such right, for that would be to give the executor power over the land, which by law, on the death of the testator or intestate, vests immediately in the heir or devisee. Nor did such right arise by the agreement between the distributees, for there is no pretence of any written agreement, and in no other way can a lien of this character on land be created.

We have examined the accounts of the executor (from which the final account was made), and find no item in either of them arising from payment of debts of the testator which are charges on the real estate. The personal estate was by law first charged with the payment of the debts, and ought not to have been distributed until they were paid. The executors would have been liable to the creditors as for a *devastavit*, because of the distribution, but for the fact (as is shown by the subsequent accounts of the executors) that a sufficient amount of the personal estate remained in their hands for the payment of all unpaid debts, and was actually so appropriated.

Although the appellee had no interest in the personal estate, the law charged the debts of the testator upon it. The burden of these debts rested on the personal estate, not on the real, and her lands are not subject to sale to reimburse the personal estate or the owners of it. If the surviving executor had paid these debts out of his own funds, and if there was not in his hands personal property out of which he could be reimbursed, a different question would be presented.

There existed, then, no right on the part of the surviving executor to subject the lands of the appellee to sale, either for the purpose of equalizing the shares of the devisees or for the purpose of reimbursing the executor for the payments made by him of the debts of the testator, and the decree of the chancellor in both cases must be affirmed, unless the executor can in one or the other proceeding fix a charge on the land for the taxes paid by him.

An executor, while he has no interest in the lands of his tes-

tator unless it be given by the will, or where there is a deficient personal estate, may, and probably ought, to pay the taxes on the land, to preserve it unencumbered, so that it may be speedily appropriated to such debts as the personalty may fail to pay, and on final account he ought to be credited with the amount so paid. *Bowers et al.* v. *Williams*, 34 Miss. 324.

In the cases at bar we have, as hereinbefore stated, reached the conclusion that the father of Ella Gray took a fee-simple title in the land, but that the personal estate at his death passed to the other children of the testator. In the personal estate then remaining in the hands of the surviving executor she had no interest other than the right to have it appropriated to the payment of such debts as might be a charge on her lands. The taxes on the lands were not debts due by the estate of the testator, but were annually arising debts due by her to the State, and to the counties in which the lands were situated. The payments of these taxes by the executor, to the extent that they were paid on her interest in the land, were made, not from a fund in which she had an interest, but from one which belonged to other persons; and as the executor was authorized by law to appropriate these funds to the payment of these taxes, he is entitled to subject the lands to sale to indemnify the estate which he represents, or to indemnify himself if the taxes were paid from his private funds. In taking this account the chancellor ought to have disregarded all other items of account except those for taxes, of which appellee is chargeable with such proportionate part as her interest in the land bears to the whole (one-fourth). The chancellor erred in rejecting so much of the account as was for taxes levied for military purposes during the war, wherever these amounts were separable from the other taxes, and in rejecting the whole account for those years in which such taxes were levied and were not separable from the other taxes  It is true that no sale could have been made for these taxes which would now be upheld, but this is because of the final result of a war unparalleled in history, the end and result of which no man could see or fore-

tell.   If it was the duty of the executor to pay taxes at all, he must be protected in the payment of those which were levied by the authority of a State capable of enforcing its demands by subjecting to seizure the personal property of the estate and by making a sale thereof, which would at that time have been upheld by every court exercising its jurisdiction within the limits of the State.

The taxes paid by the husband of Mrs. Potts, who was in possession of one of the tracts of land, enjoying the rents and profits, ought not to have been repaid to him by the executor, and it was right to refuse any allowance therefor.

Both decrees are reversed and causes remanded, to be proceeded with in accordance with the views herein expressed.